UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EZEKIAL FLATTEN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRUCE SMITH, *et al.*,<br><br>Defendants. | Case No. 21-cv-07031-SI<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTIONS TO DISMISS FIRST<br>AMENDED COMPLAINT WITHOUT<br>LEAVE TO AMEND**<br><br>Re: Dkt. Nos. 59, 60 |

On April 28, 2022, the Court held a hearing on defendants' motion to dismiss the first amended complaint. For the reasons set forth below, the Court GRANTS the motion without leave to amend.

**BACKGROUND**

**I.      The Original Complaint**

On August 9, 2021, plaintiffs Ezekial Flatten, William Knight, Ann Marie Borges, and Chris Gurr filed this lawsuit against defendants Bruce Smith and Steven White in the Superior Court for the County of Mendocino. On September 10, 2021, Smith removed the case to this Court, asserting federal question jurisdiction.

The original complaint asserted a single cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and alleged that Smith and White were members of:

> [A] longstanding and continuing RICO conspiracy involving law enforcement officers in Mendocino County and surrounding jurisdictions conducting the affairs of an enterprise including the Mendocino County Sheriff's Department and the Mendocino County District Attorney's Office through a pattern of racketeering

United States District Court
Northern District of California

> activity consisting of extortion to obtain marijuana, guns and cash from victims in possession of marijuana by unlawfully searching their residences, stopping, detaining Plaintiffs and hundreds of other victims, committing robbery, obstruction of justice, money laundering, tax evasion, and structuring currency transactions to evade the currency transaction reporting requirement.

Compl. ¶ 5 (Dkt. No. 1).  Smith was a Sergeant with the Mendocino County Sheriff's Office and assigned to head the County of Mendocino Marijuana Eradication Team ("COMMET") from 2007 until January 2018, and White was employed by the California Department of Fish and Wildlife ("CDFW") from 1996 until December 2020, and he supervised CDFW's Wetland Enforcement Team ("WET").  *Id*. ¶¶ 27-28.  The complaint alleged that the other members of the RICO conspiracy include the Mendocino County District Attorney, David Eyster; former Mendocino County Sheriff, Bill Allman; former Mendocino County Undersheriff Randy Johnson, and two former Rohnert Park[1] Police Officers, Jacy Tatum and Joseph Huffaker.  The complaint alleged that "[f]rom 2007 through 2011, Defendant Smith worked with and mentored co-conspirator Tatum on a 'task force' of which both were members or participants."  *Id.* ¶ 21.  Allman was Sheriff from January 2007 until December 2019, and Johnson was Undersheriff from January 2007 until March 2018.  *Id.* ¶¶ 30-31.

Most of the allegations of the complaint involved former Rohnert Park Police Officers Tatum and Huffaker, who were members of a Rohnert Park drug interdiction team.  *Id*. ¶¶ 76-77, Ex. A.  The complaint alleged that Tatum and Huffaker engaged in numerous acts of "highway robbery under the guise of drug interdiction" by conducting pretextual traffic stops of individuals who were driving on Highway 101 in Mendocino and Sonoma counties.  *Id.* at ¶¶ 38-70.  Sometimes Tatum and Huffaker would pose as agents from the Bureau of Alcohol, Tobacco and Firearms.  *Id.* Tatum and Huffaker would search the vehicles for marijuana, seize marijuana they found under threat of arrest without reporting or checking the seized marijuana into evidence, and then sell the marijuana on the black market for their personal profit.  *Id.*

Plaintiff Flatten was one of the people stopped by Huffaker and another individual on December 5, 2017, while Flatten was driving in Mendocino County with three pounds of marijuana

---

[1] Rohnert Park is in Sonoma County, which is south of and adjacent to Mendocino County.

in his vehicle; the complaint alleged that other individual was defendant Smith, although the complaint quoted from and attached an affidavit by an FBI special agent stating that the other individual was Tatum.[2]  Compl. ¶ 87 & Ex. A.  Flatten reported the incident to the Mendocino County Sheriff's Office, the Mendocino County District Attorney, federal law enforcement agencies, and to the media.  Compl. ¶¶ 16, 82.  Flatten was interviewed by the FBI on December 11, 2017.  *Id.* ¶ 16.

The complaint alleged that on January 30, 2018, alleged co-conspirator Undersheriff Randy Johnson telephoned Flatten in response to Flatten's certified mail complaint, telling Flatten "no crime was committed" and "we [Mendocino County law enforcement] will not investigate;" and (2) on February 5, 2018 alleged co-conspirator District Attorney David Eyster advised Flatten that the DA's office would not investigate Flatten's allegations.  *Id.* (brackets in complaint).  The complaint also alleged that after Flatten's complaints were reported by the media, alleged co-conspirator Mendocino County Sheriff Allman directed Tatum to issue a press release exonerating Mendocino County law enforcement with regard to Flatten's stop.  *Id.* ¶ 83.  According to the complaint, "Tatum's press release confused and conflated the details of the robbery of Flatten on December 5, 2017, with another similar cannabis robbery on December 18, 2017, in Mendocino County when 30 pounds of cannabis [were] stolen by Tatum and another officer from a different victim – also driving a white SUV." *Id.* ¶ 15.[3]  "Following the bogus press release, an internal investigation was launched at the Rohnert Park Department of Public Safety.  Shortly thereafter, co-conspirator Tatum resigned from the force, co-conspirator Huffaker was placed on administrative leave, and the Director of the

<hr>

[2]  In 2021, Tatum and Huffaker were indicted in the Northern District of California for several counts of extortion and conspiracy to commit extortion based on the pretextual traffic stop and extortion scheme.  *See United States v. Tatum et al.*, CR 21-374 MMC.  The FBI agent's affidavit was filed in the criminal case.  Flatten's stop is the basis of Count Two of the criminal indictment in *United States v. Tatum et al.*, which is charged against Huffaker only.  *See* Dkt. No. 33 in CR 21-374 MMC.

On December 1, 2021, Tatum pled guilty to Counts One, Four and Five of the indictment (Conspiracy to Commit Extortion Under Color of Official Right in violation of 18 U.S.C. § 1951; Falsifying Records in a Federal Investigation in violation of 18 U.S.C. § 1519; and Tax Evasion in violation of 26 U.S.C. § 7201).  Dkt. No. 47.  Tatum is scheduled to be sentenced on June 8, 2022.  Dkt. No. 70.  A status conference for Huffaker's case is scheduled for May 6, 2022.  Dkt. No. 72.

[3]  Plaintiffs have attached the press release as Exhibit A to the first amended complaint.

United States District Court
Northern District of California

Department announced his retirement." *Id.* ¶ 84.

In November 2018, Flatten sued the City of Rohnert Park, Tatum, Huffaker, The Hopland Band of Pomo Indians, Steve Hobb, and Doe defendants, alleging numerous causes of action, including a claim under RICO, based on the December 5, 2017 incident. *Id.* ¶ 22; *see Flatten v. City of Rohnert Park, et al.*, Case No. 3:18-cv-06964 HSG (N.D. Cal.).[4]  The original complaint in that case alleged that Huffaker and Steve Hobb, the Chief of Police for the Hopland Band of Pomo Indians, were the individuals who stopped Flatten on December 5, 2017.[5]  After Flatten filed his lawsuit against the City of Rohnert Park, Tatum and Huffaker, other individuals filed lawsuits in federal court alleging that they too had been stopped and victimized by Tatum and Huffaker.  Compl. ¶ 22.

With regard to plaintiffs Knight, Borges and Gurr, the original complaint alleged that they received provisional permits to grow marijuana in Mendocino County pursuant to a Mendocino County cannabis cultivation permit program, and that sometime after they received their permits, law enforcement agents obtained and executed search warrants at their properties under the pretext that plaintiffs were illegally diverting water.  In Knight's case, White and Smith were part of a team that confiscated marijuana and guns during the execution of a search warrant on September 21, 2017 at Knight's property in Ukiah, California.  The complaint alleged, on information and belief, that

---

[4] Defendant Smith requests the Court take judicial notice of the original complaint in *Flatten v. City of Rohnert Park*, as well as of various other documents, such as copies of portions of the Mendocino County Code relating to cannabis cultivation, returns to search warrants, court documents, and other public records.  Plaintiffs do not object to the Court taking judicial notice of the existence of these documents, but do object to the Court drawing inferences from these documents regarding any disputed facts.

The Court GRANTS defendant's request for judicial notice of the existence of the documents and does not draw any inferences regarding disputed facts from these documents. For example, the Court does not draw the inference – asserted by Smith – that because Smith started working as the chief investigator for the Lake County District Attorney on December 4, 2017, he could not have been the person who stopped Flatten on December 5, 2017.

[5] The docket in that case shows that in January 2019, Flatten dismissed Hobb and the Hopland Band of Pomo Indians without prejudice, and that Flatten later filed an amended complaint naming "Doe 1" as the individual who, along with Huffaker, conducted the pretextual traffic stop and extortion. *See* Dkt. Nos. 21, 23, 37 in Case No. 3:18-cv-06964 HSG (N.D. Cal.) (First Amended Compl. at ¶ 10). The parties settled the case in November 2019, and the case was dismissed. *See* Dkt. No. 73 in Case No. 3:18-cv-06964 HSG (N.D. Cal.).

United States District Court
Northern District of California

although a Declaration of Destruction was signed by Watershed Enforcement Team member Ryan Stephenson, the seized marijuana "was not destroyed and that no reliable evidence exists to prove that it was.  Rather, in furtherance of the racketeering conspiracy alleged herein, the marijuana was stolen and sold by Defendants and/or their co-conspirators."  *Id.* ¶ 115.[6]

The complaint also alleged that on September 15, 2020, District Attorney Eyster "initiated criminal prosecution of [p]laintiff William Knight in violation of 18 U.S.C. § 1512(b)(1)," and plaintiffs  alleged on information and belief that Eyster intended to intimidate and threaten Knight "to influence, delay or prevent the testimony of William Knight in an official proceeding,"  namely the federal grand jury proceeding in the U.S. District Court for the Northern District of California that returned the indictment against Tatum and Huffaker.  *Id.* ¶¶ 117-18.  The state court criminal complaint against Knight alleges that Knight and another individual committed the crime of unlawful cultivation of marijuana with environmental violation in violation of Cal. Health & Safety Code § 11358(d)(3)(D) by cultivating six or more marijuana plants and unlawfully diverting or obstructing the natural flow of water.  Smith's Request for Judicial Notice, Ex. G (Dkt. No. 59-3).

As to Borges and Gurr, the complaint alleged that on August 10, 2017, White, Smith, and other CDFW agents executed a search warrant at Borges' and Gurr's property in Ukiah, California, and confiscated marijuana and guns.  Compl. ¶ 100.[7]  Borges and Gurr filed a federal lawsuit seeking, in part, the return of the seized marijuana and guns.  Compl. ¶ 100; *see Borges et al. v. County of Mendocino*, C 20-4537 SI (N.D. Cal.).  Plaintiffs alleged that "Defendant White now claims that he and defendant Smith put the plants into a dump truck at the COMMET office.  According to defendant Smith the plants were later taken to an undisclosed location.  There are no

---

[6] Smith has filed a copy of the return to the search warrant, as well as a copy of the search warrant and the affidavit and statement of probable cause signed by Warden Ryan Stephenson of CDFW in support of the search warrant application.  Smith's Request for Judicial Notice, Ex. D (Dkt. No. 59-3).

[7] Smith has filed a copy of the return to the search warrant, as well as a copy of the search warrant and the affidavit and statement of probable cause signed by Warden Mason Hemphill of CDFW in support of the search warrant application.  Smith's Request for Judicial Notice,  Ex. C (Dkt. No. 59-3).

documents reflecting the chain of custody of the plants after they were seized."  Compl. ¶ 101.[8]

Although the complaint alleged that the RICO conspiracy encompassed "hundreds" of other searches and seizures of "many tons of cannabis" by COMMET, the only other seizure specifically identified in the complaint involved "Old Kai":

> 23.  On December 22, 2017, "Old Kai," a legally licensed distributor of cannabis carrying 1,875 pounds of cannabis from local farms in a van, was stopped by California Highway Patrol ("CHP") officers in Ukiah – the Mendocino County seat of government.  CHP called in COMMET, supervised by Defendant Smith, which took possession of the 1,875 pounds worth nearly $2 million.  Like most of the many tons of cannabis seized by COMMET team members and other law enforcement officers in contiguous jurisdictions conducting so-called "Marijuana interdiction" or "eradication efforts" during the decade from 2007 through 2017, the seized cannabis has disappeared with no records proving it was destroyed.

*Id.* ¶ 23.  The complaint continued,

> On information and belief, these defendants and/or their co-conspirators have sold tons of seized cannabis as well as hundreds of guns.  They have also stolen millions of dollars in cash.  They have filed false and fraudulent income tax returns, committed money laundering and filed false reports to conceal these crimes.  Hundreds of these seizures were purportedly authorized by search warrants sought and obtained by members of COMMET or WET with the blessing and rubber stamp of the District Attorney's Office and local judges.

*Id.*

Defendants moved to dismiss the complaint for failure to state a claim, and at a November 19, 2021 hearing on defendants' motion, the Court granted the motions to dismiss and granted plaintiffs leave to amend. The Court found,

> The Court concludes that the complaint does not state a claim under RICO because most of the allegations relate to Rohnert Park Police Officers Tatum and Huffaker and acts that they allegedly committed, and there is little to connect Defendants White and Smith, or the Mendocino County alleged co-conspirators, to what the Rohnert Park officers were doing.  The strongest connection is the allegation that Defendant Smith and Officer Huffaker stopped Flatten.  But, as I noted earlier, that is contradicted by the FBI agent's affidavit that plaintiffs attached to and incorporated in their complaint.  The other connections are alleged in a conclusory fashion, such as alleging that Sheriff Allman directed Officer Tatum to issue a press release as part of a coverup, or on information and belief without supporting facts, such as alleging that DA Eyster prosecuted Knight to intimidate him.   And little is alleged to have happened in Mendocino County.

---

[8]  The parties to this action stipulated that this case is related to *Borges*.  During the *Borges* action, over which this Court presided, the seized guns and a 10 pound sample of cannabis were returned to Borges and Gurr.  Dkt. No. 73 in C 20-4537 SI.

> The Court will grant leave to amend so that plaintiffs can add specific, non-conclusory allegations showing the existence of a RICO enterprise in Mendocino County and why the activities of the Rohnert Park officers are part of that enterprise. When amending, plaintiffs should include facts about why plaintiffs believe it was Smith who stopped Flatten. Plaintiffs also need to allege facts that plausibly support an inference that the actions taken by the Mendocino County defendants and alleged co-conspirators, are part of a RICO enterprise engaged in racketeering activities as opposed to the lawful activities of law enforcement officials.

Tr. at 11-12 (Dkt. No. 54).

## II.      The First Amended Complaint

Plaintiffs filed a first amended complaint ("FAC") on January 3, 2022. As with the original complaint, the FAC alleges a single cause of action under 18 U.S.C. §§ 1962(c) and (d) for "conducting and conspiring to conduct . . . the affairs of an enterprise through a pattern of racketeering activity." FAC ¶ 137. The alleged "enterprise" is "the association-in-fact which includes the Offices of the Mendocino County Sheriff and District Attorney," and the predicate offenses include the federal crimes of extortion, obstruction of justice, money laundering, and money laundering by tax fraud and evasion, and state crimes of grand larceny and extortion. *Id.* ¶¶ 138-40.

The FAC alleges that defendants' RICO criminal enterprise "had essentially four streams of revenue between 2011 and 2017." *Id.* ¶ 17. In addition to the two sources of revenue alleged in the original complaint (the pretextual "highway robbery" traffic stop scheme perpetrated by Tatum and Huffaker (and allegedly Smith), and the confiscation of marijuana and guns during the execution of search warrants and drug interdiction efforts by Mendocino County law enforcement), the FAC includes new allegations about two other sources of revenue: (1) a "zip-tie" program overseen by Mendocino County Sheriff Allman "wherein local growers could pay cash or check to the Sheriff as a bribe to protect against being eradicated" and (2) District Attorney Eyster's "'restitution' (pay to play) policy wherein growers who were eradicated and charged with a felony could pay extortion money (often in the tens or hundreds of thousands of dollars) by cash or check through the Sheriff's Office to avoid jail or prison by pleading to a misdemeanor." *Id.*

The FAC describes the "zip-tie" program as follows:

19. By 2008 Sheriff Allman implemented a "zip-tie" program that became local "law" when the Mendocino County Board of Supervisors passed Ordinance 9.31 in 2008.[9] The program changed over time until it was replaced by the permit program in May 2017. On occasion, it allowed for growers to purchase from the Sheriff's Office up to 99 zip-ties at $50/plant so as to become protected from seizure and prosecution by local law enforcement.

20. There were reports that some growers purchased zip-ties directly from the Sheriff with cash prior to 2015. From 2015 to mid-2017 growers could purchase zip-ties from an assistant to Sheriff Allman, Sue Anzilotti.

21. Ms. Anzilotti recently testified that her practice was to receive cash and checks from persons purchasing zip-ties and provide them with a handwritten receipt. She did not enter the payments into a computer with one exception – payments by credit card. In addition, she did not keep her own record of the amount received and person who made the payment.

22. At the end of her shift she placed the cash and checks into a box, with related receipts, and delivered it to the "fiscal" department in the Sheriff's Office. She does not know how the money was reported or deposited. Notably, before she was employed by the Sheriff's Office, she worked with Sheriff Allman's wife, Laura Allman, for many years at a local bank where she received training in money laundering.

23. Mendocino County claimed Sheriff Allman's "zip-tie" program generated $2.15 million between 2011 and 2013 according to budget reports.

---

[9] The ordinance is one of the public documents submitted by Smith and of which the Court takes judicial notice. Smith's Request for Judicial Notice, Ex. A (Dkt. No. 59-3). Ordinance No. 4235 amended Chapter 9.31 of Title 9 of the Mendocino County Code. The ordinance states that "[i]t is the purpose and intent of this Chapter to regulate medical marijuana in a manner that is consistent with State law and which promotes the health, safety, and general welfare of the residents and businesses within the unincorporated territory of the County of Mendocino by balancing: (1) the needs of medical patients and their caregivers for enhanced access to medical marijuana; (2) the needs of neighbors and communities to be protected from public safety and nuisance impacts; and (3) the need to limit harmful environmental impacts that are sometimes associated with marijuana cultivation." *Id*. at § 9.31.010.

The ordinance established the "zip-tie" program. Section 9.31.060, titled "Zip-Tie Provision," states,

> (A) For the convenience of the property owner and to assist in the enforcement of this Ordinance, and to avoid unnecessary confiscation and destruction of medicinal marijuana plants, marijuana grown for medicinal purposes in unincorporated Mendocino County may have "zip-ties" issued by the Mendocino County Sheriff's Department. For proper identification, such "zip-ties" should be securely attached to the base of individual flowering plants.

> (B) "Zip-ties" can be obtained through the Mendocino County Sheriff's Department. All applicants for "zip-ties" must present a State-issued medical marijuana identification card or a valid medical recommendation. The fee for the "zip-ties" shall be set by the Mendocino County Board of Supervisors in accordance with all applicable laws and regulations and the Master Fee Policy. Any sip-tie fees may be discounted by fifty percent (50%) for Medi-Cal, SSI, and CMSP recipients, and equivalent income-qualified veterans.

United States District Court
Northern District of California

FAC ¶¶ 19-23.

The FAC alleges the following about the District Attorney's restitution program:

24. In 2011 C. David Eyster took office as the District Attorney for Mendocino County. His office was short staffed and unable to meaningfully prosecute a huge backlog of marijuana cases. Mr. Eyster decided to implement a new restitution ("pay to play") program citing H&S Code section 11470.2 as authority to demand fines (to be determined exclusively by him) based on the number of pounds and/or plants seized from growers and presumably destroyed. Some local judges referred to it as an extortion scheme.

25. Purportedly relying on Health & Safety Code §11470.2, Eyster made deals with prospective criminal defendants, allowing them to pay an amount he calculated "on a napkin" in exchange for misdemeanor guilty pleas and probation -- thereby avoiding felony prosecution and lengthy incarceration. Although Health & Safety Code §11470.2 limits "restitution" to actual enforcement costs constituting a small fraction of the sums extracted, defendants agreed to waive an accounting and stipulated that the amount was "reasonable." Allegedly tainted assets including cash and assorted vehicles potentially subject to forfeiture because acquired with proceeds of marijuana sales were also forfeited to the Mendocino County District Attorney as part of Eyster's restitution program.

26. In an article appearing in the Los Angeles Times May 25, 2014, Eyster is quoted as explaining ". . . it's a complex calculation that [Eyster] jots out [himself] by hand, on the back of each case file." The size of the grow is not necessarily the deciding factor: in one current case the defendants claimed to have records (never verified) that they were supplying 1,500 medical users. One example of Eyster's Mendocino legal marijuana mirage involved Matthew Ryan Anderson, charged with possession of 2,000 pounds of processed marijuana worth between $3 million and $4 million locally, a sum easily multiplied by moving it to the east coast, e.g. five times that sum in New York. Anderson was allowed to pay $100,000 in "restitution" and received probation with no jail time. According to Eyster "in order to eliminate corruption," Eyster personally calculates the "restitution" for each case, calling to mind Humpty Dumpty's scintillating semantic revelation: When I use a word, Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean -- neither more nor less.' *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 171 n.18 (emphasis in original)

27. During a  2013 "restitution" hearing, Mendocino County Superior Court Judge Clay Brennan, condemned the practice as "extortion of defendants," notwithstanding reported revenue of $3.7 million from early 2011 to May, 2014, plus $4.4 million in cash and other assets forfeited to the district attorney's and sheriff's offices seized in 2013 alone. Eyster dispenses perfect justice because he personally handles every marijuana case: "The way we achieve consistency is that I do it," Eyster said. "You can't pick every dandelion in the park."

28. In 2014 Kyle Stornetta was caught with 914 marijuana plants and 2.5 pounds of processed cannabis, paid Eyster's office $42,600 and his felony charge was reduced to a misdemeanor, allowing Stornetta to walk away from a decade or more of incarceration. In 2016 Eyster explained his legal logic thus: there's a difference between lawbreakers and criminals . . . lawbreakers are not fundamentally bad people -- they are decent locals who happened to grow a little pot. Criminals are those causing harm to Mendocino County.

29. From 2015 to the present, Sue Anzilotti has been the primary person designated by the Sheriff to collect the restitution money paid pursuant to the plea deals with DA Eyster.  Ms. Anzilotti recently testified that she followed the same procedure regarding these payments, often in cash, that she used for the "zip-tie" program.  She gave out handwritten receipts but did not make any entries into a computer unless it was payment by credit card, nor did she keep a copy of the receipts in a file. At the end of her shift she would place all of the cash and checks received, and related receipts, into a box and deliver it to the Sheriff's "fiscal" office. She does not know how it was reported or deposited thereafter.

*Id.* ¶¶ 24-29.[10]

Regarding the "Highway Robbery aka Extortion," the FAC alleges that after the Sonoma County District Attorney announced in January 2017 that she would no longer be prosecuting marijuana offenses, "Tatum and Huffaker (sometimes accompanied by Bruce Smith) conducted most of their traffic stops in Mendocino County knowing that co-conspirators Allman, Johnson and Eyster would protect them in the event a complaint was made by a motorist victim."  *Id*. ¶ 32.  The FAC continues to allege that Smith and Huffaker conducted the pretextual traffic stop and robbery of Flatten, *id.* ¶¶ 63-66, without including any allegations about *why* Flatten believes it was Smith. The FAC now alleges, however, that the FBI agent's affidavit erroneously stated that it was Tatum who was with Huffaker during the stop of Flatten, and notes that the indictment did not charge Tatum with that stop and robbery.  *Id*. ¶ 87.

Regarding the alleged "Raids and Seizures for Personal Profit and Benefit aka 'Eradication and Burial,'" the FAC alleges that White and Smith have each participated in over one thousand seizures of marijuana in Mendocino County, and that at least two hundred of those seizures were

---

[10] Smith has submitted a Report by the Mendocino County Grand Jury regarding the District Attorney's Marijuana Restitution Program.  Smith's Request for Judicial Notice, Ex. E (Dkt. No. 59-3).  That report states that the District Attorney instituted the program in 2011, and that the program, "under certain circumstances, permits alleged felony offenders of State and County marijuana laws to accept a misdemeanor charge after first paying restitution as allowed by Health and Safety Code § 11470.2."   According to the report, "supporters of the program cite its effectiveness in clearing prosecutorial and judicial case backlogs, freeing support in the County Jail, and easing resources in the Probation Department. Critics deem it 'pay for play' and claim it gives undue preferential treatment to those having the money to pay the fees, thus discriminating against those who cannot pay."  The report states that the investigation "was internally generated by the Grand Jury, not in response to a complaint by the public although a complaint was later received on this topic" and that the "intent was to determine the validity of concerns expressed by members of the public and certain public officials of the propriety of the marijuana program." The Grand Jury made a number of findings in the Report, and concluded, *inter alia*, that the restitution program "has proven effective in meeting its intended goals" and  recommended that "[t]he DA continue the marijuana restitution program as long as it is pertinent to State statute and County ordinance."  *Id*.

done together, some with a warrant and some without.  *Id.* ¶ 35.  According to the FAC,

> 18. In 2007 Tom Allman took office as Sheriff and named Randy Johnson as Undersheriff and Bruce Smith as head of County of Mendocino Marijuana Eradication Team aka COMMET.  As a result, there was an increase in eradication efforts and a related failure to document how marijuana taken into custody, some of which was identified in returns of search warrants, []as destroyed.  The Sheriff entered into one or more contracts with one or more local landowners to allegedly bury marijuana that was designated for destruction pursuant to Health & Safety Code section 11479.[11]    This policy and practice is, and was, inconsistent with contemporary standards in law enforcement statewide and nationally.  For example, the Sheriff's Office did not document the chain of custody of marijuana seized from the time of the seizure to its alleged burial (destruction).  Other law enforcement agencies maintain a strict chain of custody up to and including the marijuana being burned or otherwise destroyed at designated licensed facilities.

*Id.* ¶ 18.

The FAC alleges that it was Smith and White's "custom and practice" "to leave marijuana that was not ready for harvest at the site of the eradication" and that for marijuana that was ready for harvest, "to take it off site and place it in a dump truck at Bruce Smith's COMMET office.  At a later date the seized marijuana that was reported would be declared 'destroyed' in a Section 11479 affidavit, however it was never documented when, where, how or by whom the seized marijuana was destroyed."  *Id.* ¶ 36.  The FAC alleges that Smith and White were deposed in *Borges v. County of Mendocino*, 20-4537 SI, and that their testimony "clearly establishes that untold tons of seized cannabis acquired by White and Smith during hundreds of searches and seizures were 'loaded onto a dump truck' with no record of when, where, how and by whom the marijuana was destroyed," that there was no policy in place that required a chain of custody to be maintained, and that "[i]t is reasonable to infer that Sheriff Allman and District Attorney Eyster were well aware of this practice and authorized it."  *Id.* ¶¶ 37-38.[12]

---

[11]    California Health & Safety Code § 11479 authorizes law enforcement to destroy controlled substances, including cannabis, without a court order, and sets forth specific requirements for the destruction of growing or harvested cannabis, including taking samples, photographs, measuring the gross weight, a determination that it is not reasonably possible to preserve the controlled substance in place or to another location, and the filing of an affidavit reciting compliance with the statute as well as the date and time of the destruction.  Section 11479 does not prescribe or proscribe any particular methods of destruction.  *See also Littlefield v. County of Humboldt*, 218 Cal. App. 4th 243, 254-55 (2013) (discussing § 11479 and its application).

[12]    Although the FAC refers to defendants' deposition testimony in *Borges*, the FAC does not quote the actual deposition testimony.  Smith's reply brief asserts that plaintiffs have mischaracterized defendants' deposition testimony, and Smith has submitted excerpts of his

United States District Court
Northern District of California

The FAC alleges that "Undersheriff Johnson and Sheriff Allman along with District Attorney Eyster were and are co-conspirators with Tatum and Huffaker, Defendants Smith and White and John Does 1-50 in a 'hub-and-spokes' conspiracy," with Eyster, Allman and Johnson as the "hub" and Tatum, Huffaker, Smith and White as the "spokes." *Id.* ¶ 83. "In furtherance of the conspiracy officers in the field were permitted to steal cash, guns and cannabis from those growing and/or transporting cannabis in Mendocino County, while the Sheriff and Undersheriff would

---

deposition which include the testimony that is referred to in the FAC. *See* Abaci Decl., Ex. A (Dkt. No. 70-1). In that deposition, Smith was asked about documenting compliance with California Health & Safety Code § 11479:

> Q:  In a situation like that, going back to the 11479 issues, would -- if you are the guy who is cutting down the plants and it's your men who are doing this, would you be responsible for then, you know, documenting the necessary information to comply with 11479?
>
> A:  Not if we were assisting another agency.  If it was our investigation, yes.  If it is somebody else's, we would relay the information to them, and they would deal with that portion of it.
>
> Q:  Okay.  I want to -- well, let me do the flip side of that.  If it's your mission --
>
> A:  Yes.
>
> Q: -- and other folks are assisting, is it your responsibility to write the reports and ensure compliance with 11479?· That's two questions, so let's take them one at a time.  Is it your responsibility to write the reports if it's your mission?
>
> A:  Yes.  You are starting to cut in and out a little bit on your volume.
>
> Q:  And then is it your responsibility on your missions to document compliance with 11479?
>
> A:  Yes.
>
> . . .
>
> Q:  Now, when you were documenting compliance with 11479, was there a specific – was there a form you would fill out? . . .
>
> A:  We had a declaration -- a two-page declaration that said, on this date, we seized this amount of marijuana, this amount of processed marijuana, and we complied with 11479 by doing the different boxes that you would not have to check because they would already be written in there, and then sign it and file it with the court.

Smith Depo. at 131-32. Because the FAC contains allegations about  Smith's deposition testimony, the Court takes judicial notice of the deposition excerpts submitted by Smith.

provide protection from any inquiry or investigation and the District Attorney would refuse any requests to investigate the perpetrators." *Id.* The only specific example of this alleged "hub and spokes" conspiracy involved the pretextual traffic stop of Flatten:

> Instead of pursuing the detailed description of felonies committed in Mendocino County by paramilitary perpetrators posing as federal law enforcement officers as set forth by Plaintiff Flatten (a former law enforcement officer), the Mendocino County Sheriff, Undersheriff and District Attorney stonewalled and threatened Plaintiff Flatten. Specifically, Sheriff Allman requested that Tatum cover-up the crime by issuing an exonerating press release. Instead of investigating Tatum as part of his obligation to enforce the laws against extortion, theft and impersonating law enforcement officers in Mendocino County, Sheriff Allman acted in furtherance of the conspiracy. Neither Sheriff Allman nor the Mendocino County District Attorney would investigate their co-conspirators because they had no motive to gather evidence against themselves. Allman's request for Tatum's press release and Undersheriff Johnson's threats[13] to Flatten are clear evidence of a cover-up. The motive for the cover-up was and remains self-preservation.

*Id.* ¶¶ 44, 49.

The FAC repeats the allegations regarding the California Highway Patrol's December 22, 2017 stop of an "Old Kai" van transporting 1,875 pounds of cannabis and the subsequent seizure of that cannabis by the Mendocino County Sheriff's Office, *id.* at ¶¶ 89-90, and includes new allegations about a November 7, 2020 stop by the California Highway Patrol of a licensed distributor of Humboldt-Trinity Collective, LLC. *Id.* ¶¶ 91-96. According to the complaint, on November 6, 2020, Humboldt-Trinity performed an emergency harvest of cannabis because of a snow storm, and due to exigent circumstances the cannabis was being transported without the documentation that is "typically required for transporting licensed cannabis in California." *Id.* ¶ 93. The CHP stopped the distributor and contacted the Mendocino County Sheriff's Office, which seized the entire emergency harvest, worth approximately $1,250,000. *Id.* ¶ 92. Plaintiffs have attached exhibits to

---

[13] It is unclear what "threats" this allegation refers to. The FAC alleges that after Flatten reported the stop and robbery, Johnson told Flatten "no crime was committed" and that the Sheriff's office would not investigate; that "Johnson continued to publish his false narrative in furtherance of the RICO conspiracy and cover-up by stating to Ms. Kemp [a reporter] that the Mendocino County Sheriff's Department would no longer be looking into Flatten's incident because, 'our investigation showed [the stop] was done by a legitimate agency.'"; that when the reporter Kemp interviewed Johnson after Tatum issued the press release, "Johnson falsely claimed that neither plaintiff Flatten nor B.L. had reported their highway robberies in Mendocino County . . . to the Mendocino County Sheriff's Office [b]ut both extortionate seizures had been reported."; and that when Kemp interviewed Johnson about Flatten's allegations, "Johnson claimed Flatten was lying, Flatten had more marijuana than he claimed, they had video of the entire incident, and he was retiring . . . ." *Id.* ¶¶ 78, 80, 82, 84.

13

United States District Court
Northern District of California

the FAC related to the "Old Kai" and Humboldt-Trinity seizures, including copies of letters sent by lawyers for Old Kai and Humboldt-Trinity requesting the return of the seized cannabis, and a civil complaint filed by Humboldt-Trinity seeking the return of the cannabis.  *Id.*, Exs. D, E.

The FAC also includes new allegations regarding the "rip-off" of Andres Rondon in October 2018.  The FAC alleges that Rondon was operating a permitted cannabis cultivation operation in Potter Valley, which is located within Mendocino County, and that on October 21, 2018, Rondon contacted the Mendocino County Sheriff's Office to report that his farm was being robbed by people dressed in paramilitary garb.  FAC ¶ 128.  Deputies arrived several hours later, and "[u]pon arrival, they ignored the reported robbery, challenged the credibility of the witnesses, and declined to pursue the perpetrators."  *Id.* ¶ 129.  Later that day, deputies returned to Rondon's property "with a search warrant based on an affidavit signed by co-conspirator Darren Brewster, who eventually replaced Matt Kendall as Mendocino County Undersheriff in January of 2020.  Brewster's affidavit falsely claimed that: (1) after checking it was determined that the farm was not licensed or registered for cannabis cultivation; (2) it 'was obvious' to affiant Brewster (who was then Special Agent Supervisor) that 'the owner of this property is in violation of state law without being part of the counties (sic) permitting process.'"  *Id.* ¶ 130.  The FAC alleges that Brewster's "false statements were made intentionally and in furtherance of the RICO conspiracy alleged against defendants Smith, White and their co-conspirators."  When the deputies returned with the search warrant, they stripped off and seized marijuana buds that were ready for harvest, and destroyed marijuana plants and other valuable property and equipment.  *Id.* ¶ 131.  Rondon filed a federal lawsuit against Mendocino County, former Sheriff Allman, current Sheriff Matt Kendall, Deputy Sheriff Brewster, and another deputy.  *Id.* ¶ 132, Ex. F.  *See Rondon v. County of Mendocino*, C 4:20-cv-07013 (N.D. Cal.).[14]

On February 1, 2022, Smith and White moved to dismiss the FAC for failure to state a claim.

---

[14]   Rondon also filed a state court lawsuit over the marijuana seizure.  Smith's Request for Judicial Notice, Ex. O (Dkt. No. 59-3).  The state court sustained a demurrer without leave to amend based on finding that the deputies actions' were protected by governmental immunity.  The federal lawsuit was dismissed on the ground that it was barred by *res judicata* due to the state court case. *Id.* Ex. P.

**LEGAL STANDARD**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and a complaint that fails to do so is subject to dismissal pursuant to Rule 12(b)(6).  Fed. R. Civ. P. 8(a)(2).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.  Although "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable," *id*. at 556, a plaintiff must include sufficient "factual enhancement" to cross "the line between possibility and plausibility." *Id*. at 557.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

"Establishing the plausibility of a complaint's allegations is a two-step process that is 'context-specific' and 'requires the reviewing court to draw on its judicial experience and common sense.'" *Eclectic Properties E., LLC v. Marcus & Millichap Co*., 751 F.3d 990, 995-96 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679).  "First, a court should 'identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* at 996 (quoting *Iqbal*, 556 U.S. at 679).  "Then, a court should 'assume the[] veracity' of 'well pleaded factual allegations' and 'determine whether they plausibly give rise to an entitlement to relief.'" *Id.* at 996 (quoting *Iqbal*, 556 U.S. at 679).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation omitted).  "When considering plausibility, courts must also consider an 'obvious alternative explanation' for defendant's behavior." *Eclectic Properties*, 751

1   F.3d at 996 (quoting *Iqbal*, 556 U.S. at 682).

2        If a court dismisses a complaint, it must decide whether to grant leave to amend.  The Ninth

3   Circuit has repeatedly held that "a district court should grant leave to amend even if no request to

4   amend the pleading was made, unless it determines that the pleading could not possibly be cured by

5   the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations and

6   internal quotation marks omitted).

7

8   **DISCUSSION**

9        "The elements of a civil RICO claim are as follows: '(1) conduct (2) of an enterprise (3)

10  through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to

11  plaintiff's 'business or property.'" *Living Designs, Inc. v. DuPont de Nemours & Co.*, 431 F.3d

12  353, 361 (9th Cir. 2005) (internal citations omitted); *see also Sedima, S.P.R.I v. Imrex Co., Inc.*, 473

13  U.S. 479, 496 (1985).

14       Defendants argue that the FAC suffers from the same deficiencies as the original complaint

15  and that it contains conclusory allegations that fail to establish the elements of a RICO claim.

16  Defendants contend, *inter alia*, that the FAC does not allege an association-in-fact enterprise

17  showing that the defendants were part of an enterprise with a common purpose that conducted

18  racketeering activity.  Instead, defendants argue, the FAC simply alleges an assortment of unrelated

19  incidents over the span of numerous years involving – aside from the allegations involving Tatum

20  and Huffaker – legitimate law enforcement activity by numerous law enforcement agencies.

21  Defendants emphasize the following: (1) the "zip-tie" program was adopted by the Mendocino

22  County Board of Supervisors in Ordinance 4235; (2) the searches and seizures of plaintiffs' cannabis

23  was conducted pursuant to search warrants issued by neutral magistrates; (3) the destruction of

24  cannabis is authorized by Cal. Health & Safety § 11479, which requires the filing of a declaration

25  of destruction and does not require documentation of a "chain of custody" nor does the statute

26  prohibit burying marijuana as a method of eradication; and (4) the District Attorney's restitution

27  program was established pursuant to Cal. Health & Safety Code § 11470.2, results in plea bargains

28  that are judicially overseen, and the program was investigated by the Mendocino County grand jury.

United States District Court
Northern District of California

1    Against this backdrop, defendants contend that plaintiffs' allegations of "acts of extortion, theft and

2    robbery of marijuana, guns and cash, obstruction of justice, money laundering and tax evasion,"

3    FAC ¶ 8, are wholly unsupported by any specific factual allegations that plausibly indicate the

4    existence of a RICO enterprise or conspiracy.  Defendants note that cannabis commerce is heavily

5    regulated and much of it remains illegal even under state law, and they argue that plaintiffs' RICO

6    complaint simply recharacterizes legitimate regulatory activity as extortion.

7        Defendants assert that the only specific allegations of criminal conduct involve former

8    Rohnert Park Police Officers Tatum and Huffaker, and that the FAC still fails to connect the actions

9    of those officers to a RICO enterprise involving the Mendocino County Sheriff's Department and

10   District Attorney's Office.  White notes that the FAC does not allege that he had any involvement

11   in any of the pretextual traffic stops allegedly committed by Tatum and Huffaker, including Flatten's

12   stop.  Smith argues that the allegation that he and Huffaker stopped and robbed Flatten is a bare

13   allegation unsupported by any factual detail about why Flatten believes the individual with Huffaker

14   was Smith, in contravention of the Court's specific direction to Flatten to amplify those allegations.

15   Smith also argues that the bare allegation is also not entitled to any weight in light of the fact that

16   Flatten previously alleged that the second officer was Hopland Tribal Police Chief Steve Hobb, and

17   Smith notes that the federal authorities prosecuting Tatum and Huffaker have not alleged Smith was

18   involved.

19       Plaintiffs' opposition largely repeats the allegations of the FAC and asserts that the Court is

20   required to "draw inferences in favor of the plaintiff" and that the complaint "should be construed

21   favorably to the pleader."  Opp'n at 17.  Plaintiffs argue that they have adequately alleged the

22   elements of a RICO claim and that "extorting and selling seized marijuana is not a legitimate law

23   enforcement activity."

24       The Court concludes that the FAC fails to state a claim under RICO.  As an initial matter,

25   the FAC is larded with conclusory and speculative allegations that "are not entitled to the

26   presumption of truth."  *Iqbal*, 556 U.S. at 679.  For example, plaintiffs allege "on information and

27   belief" that defendants and their alleged co-conspirators have "conducted financial transactions with

28   the proceeds of extortion," FAC ¶ 141, but the only actual extortion that is alleged in the FAC

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1  consists of the Tatum and Huffaker pretextual traffic stop and extortion scheme.  The FAC

2  speculates that Smith and White did not destroy cannabis that they seized during various law

3  enforcement raids, and instead that they sold that cannabis on the black market.  However, the FAC

4  does not contain any factual allegations in support of such a claim, such as alleging specific illicit

5  sales by Smith or White, any investigations of Smith or White for illegal activity, or statements from

6  witnesses that the seized cannabis was not actually destroyed.  Instead, the FAC assumes that Smith

7  and White must have sold seized marijuana on the black market because defendants did not

8  document "when, where, how or by whom the seized marijuana was destroyed" and there was "no

9  policy in place that required a chain of custody to be maintained from the seizure of the marijuana

10  to its alleged destruction."  *Id*. ¶¶ 36-37.   Notably, however, the FAC does not allege that Smith

11  and White violated any state or local documentation requirements, and to the contrary, the FAC

12  acknowledges that "[a]t a later date the seized marijuana that was reported would be declared

13  'destroyed' in a Section 11479 affidavit" – precisely what is required by state law.  *See* Cal. Health

14  & Safety Code § 11479.  Similarly, the FAC alleges in a conclusory fashion that District Attorney

15  Eyster is prosecuting Knight in order to intimidate him from participating in a grand jury

16  investigation, without any facts in support of such an assertion.

17        Second, aside from the pretextual traffic stop/extortion scheme allegedly perpetrated by

18  Tatum and Huffaker (and allegedly, Smith – that allegation is discussed *infra*), the remainder of the

19  conduct alleged in the FAC consists of facially legitimate law enforcement activities, and thus "a

20  significant level of factual specificity is required to allow a court to infer reasonably that such

21  conduct is plausibly part of a fraudulent scheme."  *Eclectic Properties*, 751 F.3d at 997-98 ("When

22  companies engage in sale-leaseback transactions that are facially legitimate, pay rent and operate

23  legitimate businesses for years thereafter, and otherwise act as routine participants in American

24  commerce, a significant level of factual specificity is required to allow a court to infer reasonably

25  that such conduct is plausibly part of a fraudulent scheme.").  Although the FAC is lengthy, when

26  stripped of all of the conclusory and speculative allegations, it is lacking any factual specificity that

27  would allow the Court to plausibly infer that the Mendocino County "zip-tie" program, the District

28  Attorney's restitution program, and the searches and seizures of cannabis by various law

18

enforcement agencies were part of a criminal RICO scheme.  The "zip-tie" program was authorized by a Mendocino County ordinance in 2008 and operated until 2017 when it was replaced by a permit program.  The restitution program is authorized by state law, and the Court takes judicial notice of the fact that a Mendocino County Grand Jury investigated the program and recommended its continued use.  The FAC suggests nefarious conduct by alleging that the Sheriff's assistant who received the "zip-tie" payments and the restitution payments only provided handwritten receipts and entered payments into a computer if payments were by credit card, and had received training in money laundering when she previously worked at a bank, FAC ¶¶ 21-22, 29.  But the FAC does not allege that, in fact, any funds from either program were improperly diverted or that anyone actually engaged in money laundering in connection with those programs.  Thus, although the FAC alleges that the "zip-tie" program involved "bribe[s]" by marijuana growers and that growers paid "extortion money" under the restitution program, the FAC does not allege anything more than government employees performing their jobs.  *See Wilkie v. Robbins*, 551 U.S. 537,  566 (2007) ("[I]t is not reasonable to assume that the Hobbs Act (let alone RICO) was intended to expose all federal employees . . . to extortion charges whenever they stretch in trying to enforce Government property claims."); *Sinclair v. Hawke*, 314 F.3d 934, 943 (8th Cir. 2003) ("[Plaintiff] has cited no authority for the proposition that federal employees who take regulatory action consistent with their statutory powers engage in a 'pattern of racketeering activity' if those actions are adverse to a particular industry or business activity.  In our view, the proposition is ludicrous on its face.").

The FAC alleges that the searches and seizures conducted at plaintiffs' properties in Ukiah were improper, but the FAC also acknowledges that they were conducted pursuant to search warrants signed by state court judges.  The allegations about the searches and seizures of cannabis from other persons or companies, such as the "Old Kai," Humboldt-Trinity Collective, and Rondon seizures, are similarly devoid of any allegations of criminal conduct.  Indeed, the FAC acknowledges that the seizure of the Humboldt-Trinity Collective's cannabis occurred when the cannabis was being transported without the documentation required for transport, and that the Rondon search and seizure was conducted pursuant to a search warrant signed by a judge.

Finally, with regard to the allegation that Smith and Huffaker conducted the pretextual traffic

stop and extortion of Flatten, the FAC does not contain *any* allegations about why Flatten believes that the second individual was Smith. The Court specifically directed Flatten to include such allegations in the amended complaint, and there is no explanation whatsoever for why plaintiffs failed to include any facts supporting the serious allegation that Smith extorted Flatten. Plaintiffs' opposition asserts that Flatten identified Smith from a picture. If so, that allegation should have been included in the FAC. Plaintiffs are not *pro se* litigants, but are represented by three law firms and counsel with extensive litigation experience. Particularly in light of the fact that the allegation about Smith's involvement in the Flatten traffic stop is the *only* allegation in the entire FAC alleging actual criminal activity by either defendant, the Court finds that this "'naked assertion' devoid of 'further factual enhancement'" is not entitled to any weight. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Eclectic Properties*, 751 F.3d at 999 (declining to accept conclusory assertions of property values as facts where "[t]he complaint does not cite any documents or sources for this value, nor does it explain the methodology by which this value was derived."). In sum, the FAC does not contain any plausible, non-conclusory, non-speculative allegations of criminal activity by either defendant or the Mendocino County alleged co-conspirators, much less a pattern of racketeering activity necessary for a RICO claim.

Nor does the FAC adequately allege a RICO enterprise. "An enterprise that is not a legal entity is commonly known as an 'association-in-fact' enterprise." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (en banc). "To plead an association-in-fact enterprise, a plaintiff must allege: (1) a common purpose of engaging in a course of conduct; (2) an ongoing organization, either formal or informal; and (3) facts that the associates function as a continuing unit." *LD v. United Behav. Health*, 508 F. Supp. 3d 583, 601 (N.D. Cal. 2020) (citing *Odom*, 486 F.3d at 553).

The FAC alleges that the association-in-fact enterprise included the Mendocino County Sheriff's Department and the District Attorney's office, and that Allman and Johnson (and their successors), along with Eyster were the "hubs" and that Smith, White, Tatum and Huffaker were the "spokes" of the RICO conspiracy. The alleged common purpose of the enterprise was "to continue to cover up, aid, abet and encourage the officers in the field to extort cannabis, cash and guns from growers and transporters of cannabis in Mendocino County, regardless of whether the

growers or transporters are licensed by the State of California and/or Mendocino County and regardless of whether the extortion is purportedly authorized by a valid warrant, a pretextual warrant, no warrant, probable cause, or no probable cause." FAC ¶ 10.  As discussed above, however, aside from Huffaker and Tatum's highway extortion scheme, the other alleged "extortion" in the FAC consists of facially legitimate law enforcement activities.  *See Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp*., 235 F. Supp. 3d 1132, 1175 (E.D. Cal. 2017) (holding plaintiffs failed to allege an association-in-fact and dismissing RICO claims because "[t]hough plaintiffs now argue in conclusory fashion that they have alleged the existence of a common purpose, the FAC pleads no specific facts indicating that defendants acted with an objective unrelated to ordinary business or government aims").  The FAC alleges that Sheriff Allman, Undersheriff Johnson, and District Attorney Eyster engaged in a "cover up" of the Flatten traffic stop because Allman directed Tatum to issue the press release exonerating Mendocino County law enforcement, Eyster told Flatten that his office would not investigate, and Johnson stated that "no crime was committed" and that his office would not be investigating.  These allegations are both conclusory and consistent with an "obvious alternative explanation for defendant's behavior" – that Allman, Eyster and Johnson were unaware of Tatum and Huffaker's scheme and believed that the stop was legitimately conducted by Rohnert Park police officers.  *Eclectic Properties*, 751 F.3d at 996, 998 (affirming dismissal of RICO claim alleging conspiracy to inflate commercial property values where complaint failed to allege specific facts tending to exclude "a plausible and innocuous alternative explanation").  At the most, plaintiffs have alleged that Johnson told a reporter that Flatten and B.L. did not report the stops to his office when they did; that allegation does not a RICO conspiracy make.

In sum, the Court concludes that the FAC fails to allege the elements of a RICO claim, and accordingly GRANTS defendants' motions to dismiss.  Because the Court dismisses plaintiffs' RICO allegations, the Court also dismisses plaintiffs' allegations of a RICO conspiracy.  *Eclectic Properties*, 751 F.3d at 1000.

The Court also concludes that further leave to amend is not warranted.  The motions to dismiss the original complaint and the FAC were exhaustively briefed and plaintiffs failed to cure

the numerous deficiencies identified both in that briefing and the Court's order on the initial motion to dismiss.  In the Court's view, the FAC falls so far short of alleging a RICO claim that it is clear that further leave to amend would be futile.[15]  Accordingly, the Court DENIES leave to amend.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motions to dismiss the FAC and DENIES leave to amend.

**IT IS SO ORDERED**.

Dated: April 29, 2022

_____

SUSAN ILLSTON
United States District Judge

---

[15] At the hearing, plaintiffs' counsel discussed new allegations that counsel would add if granted leave to amend, such as allegations about a warehouse in Ukiah where seized cannabis is allegedly stored because people have been seen carrying duffel bags out of the warehouse, and a lieutenant who lives on or near the warehouse and who therefore must be providing security for the warehouse, and allegations about a trucking company owned by someone who knows Sheriff Allman and that the company has too many trucks to be simply involved in legitimate trucking business.  As described by counsel, these allegations are speculative and conclusory and do not plausibly indicate the existence of a RICO conspiracy.